IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


BETTY TURNER, As Administratrix
of the Estate of Jeffrey Turner,

                              Plaintiff,                    Case No. 3:07 CV 274

            -vs-
                                                           <u>MEMORANDUM OPINION</u>
CITY OF TOLEDO, et al.,

                              Defendant.

KATZ, J.

        This case stems from the death of Toledo resident Jeffrey Turner ("Turner"), who was

subjected to multiple taser administrations by Toledo Police officers and by Lucas County Jail

("LCJ") deputies.  Plaintiff Betty Turner ("Plaintiff"), as Administratrix of the Estate of Jeffrey

Turner, subsequently brought this 42 U.S.C. § 1983 action against the City of Toledo, the City of

Toledo Police Department ("TPD"), Lucas County, the Lucas County Sheriff's Department, and

seven individual TPD officers.  Plaintiff's complaint alleges violations of Turner's *Fourth* and

*Fourteenth Amendment* rights under the Constitution, as well as state law claims for assault and

battery.[1]

---

[1] Plaintiff originally filed a state court action in the Lucas County Court of Common Pleas.  That
case was stayed pending resolution of a United States Department of Justice ("DOJ") investigation
of the incident.  While the case was stayed, Plaintiff filed the instant action in this Court, and
Plaintiff ultimately voluntarily dismissed the state court action.  (Doc. 167 at 2).
        In the instant matter, Plaintiff amended her complaint once and has made numerous
changes to the named Defendants, including a voluntary dismissal without prejudice of two TPD
officers.  Further, this Court granted judgment on the pleadings for three LCJ deputies, denied
Lucas County's motion to dismiss, and denied the Lucas County Sheriff's Department's motion
for judgment on the pleadings.  The Court has also denied sundry motions for reconsideration of
the above-described rulings.

Currently pending are six motions, which, combined, seek immunity and/or summary judgment for all eleven Defendants.  Also pending is a motion to strike filed by two Defendants, which seeks to strike certain material that Plaintiff attached to one of her opposition briefs.  For the reasons that follow, all of Defendants' motions are granted.  (Doc. 133; Doc. 145; Doc. 148; Doc. 153; Doc. 167; Doc. 169; Doc. 184).

## I. Background

At approximately 6:00P.M. on January 31, 2005, Defendant TPD Officers Doug Lewis and Brian Young received a police dispatch of a suspicious person standing in the road that travels behind The Toledo Museum of Art and leads to the Museum's parking lot.  Upon their arrival, Lewis and Young observed Turner holding a bible and standing on the edge of the street near the curb, close to the parking lot entrance.  Importantly, all of the events behind the Art Museum–including Turner's presence before Lewis and Young arrived, through the time Turner was put in the back of a police wagon and transported to the Lucas County Jail–were captured on the Art Museum's surveillance camera.  (Doc. 159, hereinafter, "Museum Video").  The surveillance footage does not provide a fluid video, but instead depicts what happened in a quick succession of frame-by-frame shots.  Moreover, the footage contains video only, and does not contain audio.  Evidence related to conversations or any other audible noises, such as shouting, comes from Defendants' depositions.

Lewis and Young approached Turner, who was staring into the distance and babbling incoherently.  The Officers began asking Turner why he was standing in the street, but at first, Turner just continued babbling.  Eventually, Turner responded that he was "waiting for Jesus," and "going to see Jesus."  The Officers asked if he could wait on the sidewalk, but Turner was insistent that he remain in place.  Early in the encounter, Young, who is a member of the TPD Crisis

2

Intervention Team ("CIT") and has received training on how to deal with the mentally ill, suspected that Turner suffered from mental health issues.  Also, at some point in the first few minutes, the surveillance video reflects that Lewis moved behind and/or to Turner's left side.  (Museum Video at 9:20).  Lewis then drew his taser and, while holding the taser in his right hand, put his left hand on Turner's left arm, as if ready to intervene.  Young remained in front of Turner and continued talking to him.

After several minutes of back-and-forth, the officers asked Turner for identification, at which point Turner "started getting a little more normal . . . ."  (Dep. Brian Young, Doc. 121 at 54:22-24) (hereinafter, "Young Dep.").  Turner refused to provide identification, said he did not have to talk to the officers, and said he was not going anywhere.  Lewis and Young responded that Turner could not stand in the street.  They further told him they would check him for weapons and warrants, and if neither was an issue they would give him a ride home.  Lewis and Young then attempted to walk Turner to their patrol car, but Turner "tensed up."  (Dep. Doug Lewis, Doc. 119 at 38:14-17) (hereinafter, "Lewis Dep."); (Young Dep. at 54:20-55:4).  In response, Lewis and Young "talked him back down," telling him they meant no harm, but were there to find out what was going on and why he was standing in the street.

The surveillance video reflects that at some point during the conversation, the three men moved the few steps over to the patrol car, but Turner then appeared to abruptly turn around and walk back to his spot.  (Museum Video at 12:00).  It is not clear whether this is the point at which Turner "tensed up," or whether this was just part of the ongoing conversation.  In any event, the video shows that when Turner returned to his spot, Lewis stepped back behind Turner with his taser drawn and left hand on Turner's arm.  Young stepped back in front of Turner and continued talking to him.

After more conversation, the three men again moved back to the patrol car where Lewis and Young intended to check for weapons and warrants. Turner stood next to and was facing the side of the patrol car.  Lewis stood slightly back from Turner, taser trained, and Young began to pat-down Turner for weapons.  As he did so, however, there was a struggle, and Lewis responded by deploying his taser in dart mode.[2]  The taser's darts hit Turner in the back and Turner fell to the ground.  (Museum Video at 14:05).  The officers then rolled Turner onto his stomach and Young attempted to handcuff him, but Turner rolled from side-to-side and did not give Young his hands. Lewis, who continued to stand over Turner holding the taser, told Turner several times to put his hands behind his back or he would be tased.  Turner failed to comply, and with the darts still in Turner's back Lewis deployed the taser a second time, enabling Young to cuff one of Turner's hands.  Lewis again warned Turner several times to comply and then tased him a third time, enabling Young to gain control of Turner's other hand, and then to cuff both hands together behind Turner's back.  During the struggle, Lewis called for backup.

After Turner was handcuffed he remained laying on his stomach on the ground for a period of some minutes before backup arrived.  During this time Turner can be seen rolling on the ground and kicking his legs.  At one point, Turner appears to roll onto his back and then attempt to stand, but falls to the ground before he is fully erect.  (Museum Video at 16:14).  Lewis testified that he warned Turner several times that he would be tased if he did not stay on the ground.  (Lewis Dep. at 48:17-49:9).  Indeed, Lewis attempted to deploy his taser during this time, but was unsuccessful

---

[2]

A taser can be deployed in dart mode or in drive-stun mode.  In dart mode, the taser fires a hooked barb, or dart, which is connected to the taser by a long, electricity conducting wire.  In drive-stun mode the darts are removed and the taser is applied directly against the individual's skin or clothing.  *See Goebel v. Taser Int'l, Inc.*, 2007 U.S. Dist. LEXIS 68560, at *5 n.2, *6 n.3 (N.D. Ohio Sept. 14, 2007).

4

because one of the darts had dislodged from Turner's back.  (Lewis Dep. at 49:5-16).  After the unsuccessful deployment, Lewis testified that he released the taser's wires from the cartridge and holstered the taser.  (Lewis Dep. at 49:17-50:4, 53:9-11).   Turner continued to thrash on the ground.

In response to Lewis' call for backup, Defendant TPD Officers Michael Haynes and Michael Murphy arrived on the scene.  The video shows that after Haynes and Murphy exited their patrol car, all four officers immediately began restraining Turner.  (Museum Video at 18:45). Haynes and Lewis each worked to gain control of Turner's legs while Murphey and Young worked to restrain Turner's upper body.  All four officers testified that Turner continued kicking and resisting, and further testified that despite their combined efforts, Turner was able to kick free of Haynes and Lewis' grasp on each of his legs, kicking Haynes in the face when doing so. Responding to Turner's resistence, Lewis drive-stun tased Turner twice on the back of the neck, which allowed Haynes to cuff Turner's ankles together.  The officers then put Turner in a hog-tie restraint by using a third set of handcuffs to secure Turner's ankle cuffs to his wrist cuffs.

Soon after Turner was put in the hog-tie, Defendant TPD Sergeant Daniel Ray arrived and took command of the scene.  When he arrived, Sergeant Ray described Turner as "spinning on the ground."  (Doc. 184-3 at ¶4).  The officers told Sergeant Ray that Turner violently resisted, and that he posed a risk to himself, officers, and city property if he were to be transported in a patrol car.  Thus, a police wagon was called to the scene.

Thereafter, Defendant TPD Officers James Cornell and Kevin Konz arrived on scene with a wagon.  Before transporting Turner, Sergeant Ray discussed concerns about positional asphyxia

5

with Cornell and Konz,[3] but Ray determined that due to Turner's combative nature, Turner should be transported in the hog-tie restraint and without any officers in the back of the wagon.  To monitor for positional asphyxia, however, Sergeant Ray directed Cornell and Konz to constantly watch Turner and engage him in conversation.  The officers then loaded the hog-tied Turner into the wagon.

Cornell and Konz drove the wagon to the LCJ, and were followed by Lewis and Young, and Sergeant Ray.  Throughout the five minute drive, Konz monitored Turner via the wagon's video camera.  Konz also physically turned his body so he could directly see and talk to Turner.  Turner responded to Konz's questions by shouting obscenities.

Once at the jail, Konz told Turner that he and Cornell would remove Turner's restraints and let him walk inside if he behaved.  Turner responded that if they removed his restraints he would kick them.  (Dep. James Cornell, Doc. 124 at 27:19-28:7) (hereinafter, "Cornell Dep."); (Dep. Kevin Konz, Doc. 123 at 26:14-19) (hereinafter, "Konz Dep.").  Thus, Turner remained in his restraints, and Konz, Cornell, Lewis, and Young carried Turner into the LCJ.  Once inside, the officers placed Turner in a holding cell and removed his leg restraints, but at the direction of LCJ Deputy Leach, Turner's hands remained cuffed until after he was booked.  Turner was booked into the jail at approximately 6:45P.M.  He was then given a bagged lunch, a banana, and juice.  The LCJ deputy who booked Turner noted that Turner did not have any obvious pain, injury, or illness requiring the need for nursing intervention.  (Doc. 298 at 34).

---

[3]

"Asphyxia is a decrease in blood oxygen levels or an increase in blood carbon dioxide levels–either of which can kill.  Positional asphyxia is asphyxia that results from body position." *Price v. County of San Diego*, 990 F. Supp. 1230, 1237 (S.D. Cal. 1998) (citation omitted).

Two hours later, at 8:55P.M., Turner began shouting and pounding on his cell door.  Two LCJ deputies entered Turner's cell to restrain him, but Turner resisted, sending one deputy into the wall.  Deputy Leach, who was monitoring the situation from outside the cell fired a taser at Turner in dart mode, but Turner removed the taser dart as he continued to resist the deputies.  Finally, Leach drive-stunned Turner on the back of the leg, allowing the other deputies to handcuff him.  While Turner was still conscious and responsive at this point, Leach instructed another deputy to call a nurse in accordance with LCJ policy.  The nurse arrived minutes later, but Turner became unresponsive.  Deputies called 9-1-1, but at 9:40P.M Turner was pronounced dead at a nearby hospital.

Notably, the LCJ booking area is monitored by a security camera, which captured some of the events inside the jail.  (Doc. 160-1, hereinafter, "LCJ Video 1"); (Doc. 160-2, hereinafter, "LCJ Video 2").  Unlike the museum surveillance video, the LCJ surveillance camera offers a clear, fluid video, as well as audio that makes it relatively easy to hear conversations going on inside the booking area.  Indeed, after their arrival at the jail, the video shows Lewis, Young, Cornell, and Konz walk into, through, and out of the booking area while carrying the hog-tied Turner.  (LCJ Video 1 at 18:23:50).  The video shows the officers walk back into the booking area after putting Turner in a cell, and shows Lewis and Young go through the booking process.  While doing so, the booking official asked Lewis and Young whether they tased Turner.  Lewis responded, "I tased the fuck out of him," and Young added, "He didn't like that shit."  *Id*. at 18:29:30.

Dr. Cynthia Beisser, the Lucas County Deputy Coroner and forensic pathologist who performed Turner's autopsy, classified Turner's death a homicide and concluded that "Turner died from sudden arrhythmia due to the culmination of the stress and physical exertion from the altercations and multiple tasings while in the custody of the Toledo Police Department, as well as

7

the altercations and multiple tasings that took place after his transfer to the custody of the Lucas County Sheriff's Department at the jail." *Id.*

On January 31, 2007, Plaintiff instituted this action against Defendants, asserting Section 1983 claims against the City, the TPD, the County, and the County Sheriff's Department for failure to train.  Plaintiff also sued Lewis, Young, Haynes, Murphy, Cornell, Konz, and Ray, asserting Section 1983 claims for excessive force, failure to intervene, and deliberate indifference to a serious medical need, as well as state law claims for assault and battery.[4]  The Defendant officers have all filed motions for summary judgment and applications for qualified immunity.  The City, TPD, County, and Sheriff's Department likewise filed motions for summary judgment.  Defendants Cornell and Konz also filed a motion to strike material Plaintiff filed with one of her opposition briefs.

## II.  Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).  The movant may

---

[4] Also included in the action were several other TPD officers and LCJ deputies, but those Defendants have since been dismissed.

meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim.  *Id.* at 323-25.  Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2541, 91 L. Ed. 2d 202 (1986) (*quoting* FED. R. CIV. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations.  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position.  *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *see also Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000).  Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322, 106 S. Ct. at 2552.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party."  *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)).  However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact."

*Williams*, 154 F. Supp. 2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999). Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

## III. Motion to Strike

Defendants Cornell and Konz move to strike an Internal Affairs ("IA") Report (Doc. 133-1), and the Affidavit of W. Ken Katsaris (Doc. 133-2), both of which are offered to show that Cornell and Konz violated TPD policy. Plaintiff did not respond.

Defendants' motion to strike is granted. "[T]he issue is whether [Defendants] violated the Constitution, not whether [they] should be disciplined by the local police force. A city can certainly choose to hold its officers to a higher standard than that required by the Constitution without being subjected to increased liability under § 1983." *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992). To hold otherwise "would encourage all governments to adopt the least restrictive policies possible." *Id*. at 348.

## IV. § 1983 Claims

Defendants Lewis, Young, Haynes, Murphy, Cornell, Konz, and Ray filed applications for qualified immunity and motions for summary judgment as to Plaintiff's claims of excessive force, failure to intervene, and deliberate indifference to a serious medical need. Plaintiff opposes.

## A. Qualified Immunity

The federal doctrine of qualified immunity provides that government officials performing discretionary functions are immune from suit unless the plaintiff shows that the official violated

10

"clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Champion*, 380 F.3d at 900. Determining whether Defendants are entitled to qualified immunity involves a two-step inquiry. *See Scott v. Haris*, 550 U.S. 372, 277 (2007); *Hudson v. Hudson*, 475 F.3d 741, 745 (6th Cir. 2007). First, the Court examines whether the facts show that a constitutional violation occurred. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Second, if a constitutional violation is found, the Court examines whether the constitutional right was clearly established such that an objectively reasonable official would have known his or her conduct violated the right. *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). Importantly, qualified immunity is a question of law. *Champion*, 380 F.3d at 900. "[I]f there is a disagreement as to the facts, the reviewing court must consider the evidence in the light most favorable to the Plaintiff." *Landis v. Baker*, 297 Fed. App'x. 453, 2008 U.S. App. Lexis 21945, at **18 (6th Cir. Oct. 16, 2008) (citing *Champion*, 380 F.3d at 900). Further, "[i]f the legal question is dependent upon which version of facts one believes, then the jury must determine liability." *Landis*, 2008 U.S. App. LEXIS 21945, at **17. Finally, "[t]he plaintiff has the burden to 'show that the defendant is not entitled' to qualified immunity." *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005) (quoting *Blake v. Wright*, 179 F.3d 1003, 1007 (6th Cir. 1999)).

**B. Excessive Force Standard**

"*All* claims that law enforcement officers have used excessive force–deadly or not–in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the *Fourth Amendment* and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989); *see also Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (2004). The *Fourth Amendment* 'reasonableness' standard "is an objective one, which should disregard the underlying

11

intent or motivation of the defendant." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1044 (6th Cir. 1992) (citing *Graham*, 490 U.S. at 397).  Moreover, the Supreme Court has cautioned that "[t]he 'reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 visioin of hindsight . . . . [P]olice officers are often forced to make split-second judgments–in circumstnaces that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97 (internal citations omitted).  Further, "[b]ecause [the 'reasonableness' standard] 'is not capable of precise definition or mechanical application,' its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985); *Bell v. Wolfish*, 441 U.S. 520, 535-39 (1979)).

The Sixth Circuit applies the *Fourth Amendment's* 'reasonableness' test to each factual segment of an excessive force claim.  *Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002).  In other words, instead of lumping what might be multiple applications of allegedly excessive force into one sweeping *Fourth Amendment* analysis, the Sixth Circuit breaks the applications of force into segments and examines the reasonableness of each in turn.  *See Russo*, 953 F.2d 1044-45 (individually analyzing initial set of tasings, subsequent set of tasings, and use of deadly force); *Goebel v. Taser Int'l, Inc.*, 2007 WL 2713053, 2007 U.S. Dist. LEXIS 68560, at *15 (N.D. Ohio Sept. 14, 2007) (analyzing multiple taser administrations in two sets: tasings before suspect handcuffed and tasings after suspect handcuffed).  In the instant matter, the Court reviews the

reasonableness of Defendants' force as follows: first tasing (before Turner fell to the ground); second and third tasings (after Turner fell to the ground but before he was handcuffed); fourth and fifth tasings (after Turner was handcuffed but before his ankles were cuffed); the use of a hog-tie restraint and the method by which Turner was transported to the LCJ.[5]

## C. Taser Use

### 1. First Tasing

The parties paint vastly different pictures of the moments preceding Lewis' first taser deployment, and as such, offer different interpretations of two of the three *Graham* factors (whether Turner posed a threat to safety, and whether Turner resisted arrest or attempted to evade arrest by flight). *See Graham*, 490 U.S. at 396. The officers testified that Turner went to the car compliantly, (Lewis Dep. at 38:19-22), but that he began "posturing as if he was getting ready to fight" once Young began the pat-down. (Lewis Dep. at 39:10-13). They further testified that Turner then began violently throwing elbows with both arms, which necessitated Lewis' use of the taser. (Lewis Dep. at 39:6-40:18; Young Dep. at 45:5-23). Conversely, Plaintiff decries Defendants' characterization of the facts and insists the surveillance video shows that the officers

---

[5]

Defendants analyze the first three tasings as a single segment, but otherwise divide the incident into the same segments as this Opinion. Plaintiff individually discusses the different types of force used, but tends to aggregate the facts into a more singular analysis, instead of taking a segment-by-segment approach. The Court finds the most appropriate analysis is as stated in this Opinion.

physically dragged Turner to the car.  (Doc. 180 at 6).  Plaintiff maintains that this resulted in "a very brief, minor physical struggle as Mr. Turner attempted to pull his arms free from the grasp of the officers as they forcefully dragged him . . . ."  *Id*. at 23, 23 n.9.

The nature of the evidence makes this a difficult case, as illustrated by the parties' divergent narratives.  On the one hand, the officers' depositions provide a detailed, moment-by-moment account of the incident.  Similarly, the museum's surveillance video provides a rote depiction of what happened, but does so with a cumbersome, frame-by-frame quality that makes it difficult to reconcile many of the details described by Defendants, such as Turner's precise level of resistence, and whether Turner began "posturing as if he was getting ready to fight." (Lewis Dep. at 39:10-13).  Indeed, reasonable jurors could differ on whether the evidence shows that Turner violently resisted to the extent alleged by the officers.  But even viewing the facts in the light most favorable to Plaintiff, it is undisputed that "Mr. Turner attempted to pull his arms free from the grasp of the officers," resulting in a "physical struggle," albeit one that was "very brief [and] minor . . . ." (Doc. 180 at 6); (Museum Video at 13:35).  Given Turner's resistence, Lewis' use of the taser was reasonable under *Graham*, and Plaintiff therefore cannot establish a constitutional violation as to the first tasing.  *See Edwards v. City of Martins Ferry*, 554 F. Supp. 2d 797, 805-06 (S.D. Ohio 2008) (taser reasonable where eighty-two year old suspect disregarded commands and tried to pull away from officer's grasp); *DeVoe v. Rebant*, 2006 U.S. Dist LEXIS 5326, at *5, *22 (E.D. Mich. Feb. 13, 2006) (taser reasonable where suspect resisted officer's attempt to physically move–but not force–suspect into patrol car).

The Court is not persuaded by Plaintiff's emphasis on the third *Graham* factor (severity of the crime at issue).  Plaintiff stresses that upon Lewis and Young's arrival at the scene, Turner was,

14

at most, engaging in a non-violent misdemeanor by standing on the edge of the street.  In *Edwards v. City of Martins Ferry*, however, the Southern District of Ohio explained at length how an otherwise minor crime can evolve into a situation where the use of force is wholly reasonable.  554 F. Supp. 2d at 806-07.  In *Edwards*, a police officer responded to complaints of an eighty-two year old man urinating in a public park.  The Southern District of Ohio explained the reasonableness of using a taser in such circumstances, notwithstanding the minor nature of the defendant's crime:

> While the severity of the crime is not a factor in this case, it was reasonable for Officer Dojack to believe that Mr. Edwards could pose a threat in that he was resisting arrest.  While Mr. Edwards was initially stopped for a misdemeanor, the situation changed when he refused to answer Officer Dojack's initial questions.  Mr. Edwards' continued failure to respond and to comply with Officer Dojack's instructions then justified an escalation of the use of force.  Officer Dojack attempted to grab Mr. Edwards.  Mr. Edwards then backed away and put his hands up in what has been described as football goal posts.  Officer Dojack, however, interpreted this as Mr. Edwards squaring off with him.  This then justified another escalation in the use of force to the taser.  Once Officer Dojack began to restrain Mr. Edwards, he had to continue, and it seems the only way he was able to do this was with the taser.

*Id.*; *see also id.* at 800-01 (after Edwards pulled away, officer drew taser, warned Edwards not to move, and "slammed" Edwards on hood of car.  When Edwards tried to pull away again, officer deployed taser.).  In the instant matter, as in *Edwards*, Turner's initially minor crime does not abrogate his failure to comply with, and his physical resistence to, Lewis and Young.

## 2.  Second and Third Tasings

When Turner fell to the ground after the first tasing, Lewis and Young maintain that Turner continued to violently resist by kicking at them, by rolling from side-to-side, and by refusing to give them his hands to be handcuffed.  This, they argue, necessitated two more tasings by Lewis–each preceded by verbal warnings–before the officers were able to secure Turner's hands

15

behind his back. Lewis and Young rely on a number of cases finding taser use reasonable in such circumstances. *See Haney v. Dunlap*, 2009 U.S. Dist. LEXIS 25215, at *8-*9 (N.D. Ohio Mar. 26, 2009) (taser reasonable to subdue and handcuff suspect who continued to resist after being tackled); *Goebel*, 2007 U.S. Dist. LEXIS 68560, at *17-*18 (taser reasonable where decedent resisted by throwing objects at police, ignoring commands, and projectile vomiting); *RT v. Cincinnati Pub. Schs.*, 2006 U.S. Dist. LEXIS 94004, at *6-*7 (S.D. Ohio Dec. 29, 2006) (taser reasonable where minor resisted by "kicking, screaming, jerking, biting, and pushing her body away from [the officer].").

Conversely, Plaintiff again maintains that the surveillance video negates the officers' account, and instead shows that Turner took a "surrendering posture" when he fell to the ground, that he did not resist, and that he remained peaceful while the officers handcuffed him. Plaintiff maintains that as such, liability must be determined by a jury. *See Landis*, 2008 U.S. App. LEXIS 21945, at **17 ( "[i]f the [question of qualified immunity] is dependent upon which version of facts one believes, then the jury must determine liability."). Further, Plaintiff relies on *Roberts v. Manigold*, 240 Fed. App'x. 675, 2007 U.S. App. LEXIS 14514 (6th Cir. June 14, 2007). In *Roberts*, officers (Stricklen and Webb) were chasing a suspect (Roberts) on foot when Roberts fell face down into a snow bank. *Id*. at **3. Officer Webb pinned Roberts by placing a knee on his back. *Id*. Webb then began to apply handcuffs when Stricklen "repeatedly" tased Roberts. *Id*. at **4. The Sixth Circuit found Stricklen's use of the taser to be unreasonable. *Id*.

As with the first tasing, the quality of the video in this case makes it difficult to ascertain precisely what happened after Turner fell to the ground. Indeed, it is unclear whether Turner was as violent as the suspects in *Haney*, *Goebel*, and *RT*, *supra*. Even so, it is clear from the video that

16

Turner was neither compliant, nor peaceful, and that Lewis' second and third taser deployments were reasonable.  Specifically, the video depicts Turner rolling from side-to-side, kicking his feet, and shifting his hands back-and-forth as the officers tried to grab them.  (Museum Video at 14:14).  Turner did so despite Lewis' repeated warnings that Turner would be tased if he did not comply.  (Lewis Dep. at 45:9-16; Young Dep. at 20:16-20).  Moreover, Turner continued to shout profanities at the officers as he rolled on the ground.  (Young Dep. at 46:5-16).  Such circumstances render Lewis' use of the taser reasonable. *See Edwards*, 554 F. Supp. at 805-06 (taser reasonable where eighty-two year old suspect disregarded commands and tried to pull away from officer's grasp); *DeVoe*, 2006 U.S. Dist LEXIS 5326, at *5, *22 (taser reasonable where suspect resisted officer's attempt to physically move–but not force–suspect into patrol car); *Draper v. Reynolds*, 369 F.3d 1270, 1278-79 (11th Cir. 2004) (taser reasonable where suspect yelled at officer and refused to comply with demands for identification).

Plaintiff's reliance on *Roberts*, *supra*, is inapposite.  First, while the language in that case is initially ambiguous as to whether Roberts resisted, *see Roberts*, 2007 U.S. App. LEXIS 14514, at **3-**4 ("Webb grabbed Roberts's arm to *try* to handcuff him, and Roberts continually cried out for help") (emphasis added), there is no statement whatsoever that the suspect actually did resist.  *See id*.  To the contrary, the Sixth Circuit characterized Stricklen's use of the taser as "gratuitous force."  *Id*. at **8, **10 n.4.

Second, the *Roberts* court stressed that Officer Webb was "a 225-pound former running back at the University of Michigan," and that Webb had Roberts "completely pinned" by holding his leg on Roberts' back.  *Id*. at **3.  Plaintiff attempts to analogize *Roberts* to this case by making much ado about the physical stature of Defendants, but *Roberts* is plainly distinguishable on this

17

point.  The coroner's report in this case indicated that Turner was a 6'3 ", 231 pound male, (Doc.

114-7), and LCJ Corrections Officer Ginn–who was later involved in a physical altercation with

Turner–testified that in four years at the LCJ he had never encountered someone as strong as

Turner.  (Doc. 117 at 118:6-13).  Thus, the circumstances in this case–unlike those in *Roberts*–do

not indicate a situation in which Defendants could just physically impose themselves on Turner

without a risk of danger.  *See DeVoe*, 2006 U.S. Dist LEXIS 5326, at *5, *22 (attempt to *force*

suspect into patrol car after earlier resistence to attempts at moving him into car "would have

escalated the situation into a physical struggle in which Mr. DeVoe or the officers could have been

seriously injured.").

 Third, the *Roberts* court found persuasive that "Stricklen did not wait for Webb to get

Roberts under control before she used her taser on him, and Webb admit[ted] that he would have

been able to subdue Roberts without Stricklen's [use of the taser]."  *Roberts*, 2007 U.S. App.

LEXIS 14514 at **4.  This Court is mindful that it must view the instant matter from the

perspective of a reasonable officer at the scene, not with the benefit of 20/20 hindsight.  *Graham*,

490 U.S. at 396-97.  But to the extent there are instances in which such clear-cut retrospect is

appropriately within the Court's analysis, this is not one of them.  Plaintiff can point to no

evidence suggesting that Defendants believed themselves able to overcome Turner without the

taser.

 Fourth, the Sixth Circuit explicitly distinguished the facts in *Roberts* from cases that

involve "tense situations."  *Id*. at **10 n.4.  The Sixth Circuit did not specifically state why that

case did not involve a "tense situation," but the implication is that Webb had such complete control

18

of Roberts that potential dangers of the incident had been diffused.  *Id*.[6]  Conversely, the instant

matter involved a tense situation by comparison.  Neither Lewis, nor Young, had such total control

over Turner as he rolled and kicked on the ground.

### 3.  Fourth and Fifth Tasing

        After Lewis and Young cuffed Turner's hands behind his back, the officers maintain that

Turner continued to violently resist by rolling from side-to-side and by kicking at the officers.

Further, Officer Haynes stated that when he and Officer Murphy arrived to backup Lewis and

Young, Turner was "kicking pretty violently and flopping around on the ground."  (Dep. Michael

Haynes, Doc. 120 at 25:17-21) (hereinafter, "Haynes Dep.").  Defendants also maintain that Turner

kicked Haynes in the face, and that Turner was strong enough to kick free of Haynes and Lewis'

grasp on each of his legs.  Only then did Lewis tase Turner a fourth and fifth time.  Defendants cite

several cases finding taser use reasonable under such circumstances.  *See Goebel*, 2007 U.S. Dist.

LEXIS 68560, at \*19-\*21 (two tasings on already handcuffed suspect reasonable where suspect

posed threat to officers by fighting, kicking, and rolling side-to-side); *DeVoe*, 2006 U.S. Dist

LEXIS 5326, at \*5, \*22 (reasonable to tase already-handcuffed suspect where suspect refused to

enter patrol car and resisted officer's attempt to physically move–but not force–suspect into patrol

car); *Johnson v. City of Lincoln Park*, 434 F. Supp. 2d 467, 479-80 (E.D. Mich. 2006) (reasonable

---

[6]

Notably, the excessive tasing in *Roberts* was immediately preceded by a foot pursuit during which
Roberts defeated an attempted taser deployment by removing the taser dart from his back while he
ran.  *Id*. at \*\*3.  If Officer Webb's subsequent control of Roberts was so complete as to negate the
foot pursuit's obviously tense circumstances, and as to render Stricklen's use of a taser on the still
un-handcuffed Roberts "gratuitous," then the circumstances of the tasing in that case are wholly
distinguishable from the circumstances in this case.

19

to tase already-handcuffed suspect where suspect ignored warnings, thrashed around, bit, and attempted to head but officer).

Plaintiff urges that the surveillance video negates the officers' account and shows that Turner did not resist or otherwise pose a threat.

The Court finds that Lewis' use of the taser was reasonable.  For a brief period after being handcuffed, Turner seemed to lay calmly on the ground.  Soon thereafter, Turner appears to roll onto his back and then attempt to stand, but falls to the ground before he is fully erect.  (Museum Video at 16:15).  On the ground, Turner began rolling from side-to-side and thrashing his legs.  Moreover, the video shows Turner's legs kick up into the air, causing Haynes and Lewis to lurch backward (the point at which the officers testified that Haynes was kicked in the face).  (Museum Video at 19:43).  Lewis can then be seen applying his taser to Turner.  Such circumstances are clearly in-line with cases holding that taser use is reasonable, particularly *Goebel*.  *See* 2007 U.S. Dist. LEXIS 68560, at *19-*21 (two tasings on already handcuffed suspect reasonable where suspect posed threat to officers by fighting, kicking, and rolling side-to-side).

## 4.  Clearly Established Right

Even if Lewis' taser deployments were unreasonable, they did not violate a clearly established constitutional right.  *See Brosseau*, 543 U.S. at 198.  A right is clearly established when, "at the time of the challenged conduct, the contours of [the] right are sufficiently clear that every reasonable official would [understand whether] what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (internal quotation marks omitted).  In making this determination, a "district court must first look to decisions of the Supreme Court, then decisions of [the] Sixth Circuit and other

20

courts within the circuit, and finally to decisions in other circuits." *Landis*, 2008 U.S. App. LEXIS 21946, at **24-**25; *see also Russo*, 953 F.2d at 1043.  Importantly, "[o]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  Indeed, "[t]here can be 'notable factual distinctions between the precedents relied on . . . so long as the prior decisions give reasonable warning that the conduct then at issue violated constitutional rights.'" *Champion*, 380 F.3d at 902 (citing *Hope*, 536 U.S. at 740).

Plaintiff's attempt to rely on cases establishing the right of non-violent, non-resistant persons to be free from taser use is not persuasive.  As explained above, such a description does not accurately characterize the events in this case.  Rather, with regard to Lewis' first taser deployment, a right not to be tased after pulling away from an officer's grasp and causing a physical struggle–however brief or minor–was not clearly established in January 2005.  Indeed, factually analogous case law indicates otherwise.  *See*, *e.g.*, *Edwards*, *supra*, 554 F. Supp. 2d at 807 (right to be free from taser not clearly established where eighty-two year old pulled away from officer's grasp and acted like he was "squaring-off").

With regard to Lewis' second, third, fourth, and fifth taser deployments, a right not to be tased while thrashing on the ground, resisting efforts to be handcuffed and/or ankle cuffed, and ignoring commands to comply was not clearly established in January 2005.  Again, factually analogous case law indicates otherwise.  *See, e.g.*, *Goebel*, *supra*, 2007 U.S. Dist. LEXIS 68560.

Two of the most factually analogous cases in which courts did find that taser use violated a clearly established right were *Roberts*, *supra*, and *Landis v. Baker*, 2008 U.S. App. LEXIS 21946 (6th Cir. Oct. 16, 2008).  *Roberts* is distinguishable for the reasons stated above.  *Landis* is

likewise distinguishable. In *Landis*, officers followed a suspect into a swamp after an initially "minor and non-violent crime." The situation escalated into a physical altercation, and officers' subsequent attempts to subdue the suspect involved multiple tasings that were administered in quick succession. Finding a clearly established right, the *Landis* court held that officers "should have known that the use of a taser in stun mode, in rapid succession on a suspect who is surrounded by officers, in a prone position in a muddy swamp, who has only one arm beneath him, and who has just been struck several times with a baton would be a violation of a constitutional right." *Id*. at **31. Central to the Sixth Circuit's ruling, however, was the fact that the suspect's face was submerged in two feet of muddy water, and use of the taser–coupled with officers' efforts to pull the suspect's arms behind his back–caused the suspect to drown. Absent these facts, it is not clear that the Sixth Circuit would have held that the officers' taser use violated a clearly established right. *See id*. at **30 ("During all the times that he was tasered in stun mode, Keiser was in a 'semi-prone push-up position' in at least 10 inches of muddy water with officers surrounding him, with one officer kneeling on his back and one arm in a handcuff. The taser manual warns against using the taser in water . . . .").

**D. Hog-tie & Transport of Turner**

The Court finds that all Defendant TPD Officers are immune from claims regarding the hog-tie and transport of Turner because such force was not unreasonable. Turner rolled, thrashed, and kicked his legs for several minutes before the officers attempted to further restrain him. Turner then successfully thwarted four officers' efforts to do so–despite being handcuffed–even kicking one officer in the face. The officers were able to gain control of Turner's legs only after Lewis tased him two more times. It was only then that the officers hog-tied Turner and made the

22

decision to transport him in the hog-tie restraint. Such conduct is not unreasonable under the *Fourth Amendment*. *See, e.g.*, *Hill v. Carroll County*, 587 F.3d 230 (5th Cir. 2009); *Garrett v. Athens-Clarke County*, 378 F.3d 1274 (11th Cir. 2004); *Brandt v. Davis*, 191 F.3d 887 (8th Cir. 1999).

Even if the hog-tie and transport method were unreasonable, such force did not involve a clearly established constitutional right. *See Brosseau*, 543 U.S. at 198. The Western District of Kentucky's decision in *Simpson v. Thompson*, 2010 U.S. Dist. LEXIS 114941 (W.D. Ky. Oct. 27, 2010), is instructive. In *Simpson*, a suspect was hog-tied by cuffing his handcuffs to his ankle cuffs. *Id*. at *3-*4. The suspect was then placed on his belly in the rear of a police car for the fifteen to twenty minute ride to the jail. *Id*. at *4. The officer driving the car inquired as to the suspect's well-being on multiple occasions–including as soon as three to four minutes before arriving at the jail–and the officer was met with continued obscenities. *Id*. Once at the jail, however, the officer noticed discoloration in the suspect's face. *Id*. The officer removed the shackles, called for help, and initiated lifesaving measures, but the suspect was later pronounced dead at the hospital. *Id*. The Western District of Kentucky granted the officer's petition for qualified immunity, finding as follows:

> There is no Supreme Court or Sixth Circuit precedent decrying the use of the restraint method employed by the officers. While some Circuits have questioned the constitutionality of the aforementioned restraint method, other[s] have found it constitutionally valid. *Compare Garrett v. Athens-Clarke County, Ga.*, 378 F.3d 1274 (11th Cir. 2004); *Mayard v. Hopwood*, 105 F.3d 1226 (8th Cir. 1997) *with Cruz v. City of Laramie*, 239 F.3d 1183 (10th Cir. 2001). The lack of precedent from either the Supreme Court or the Sixth Circuit, combined with the split of authority over the restraint method used by the officers qualifying as excessive force, requires a finding that no constitutional right was violated.

*Id*. at *15-*16. This Court agrees with the Western District of Kentucky's analysis and conclusion.

23

The Court is not persuaded by Plaintiff's passing reference to three cases showing that the Sixth Circuit simply recognizes an arrestee's right to be free from "unduly tight handcuffing."  *See Lyons v. City of Xenia*, 417 F.3d 454, 575 (6th Cir. 1993); *Martin v. Heideman*, 106 F.3d 1308, 1312-13 (6th Cir. 1997); *Walton v. City of Southfield*, 995 F.2d 1331, 1342 (6th Cir. 1993). Plaintiff fails to inform the Court how the articulation of this right is sufficiently analogous to clearly establish the right to be free from the restraint method at issue in the instant matter.

The Court is also not persuaded by Plaintiff's reliance on *Johnson v. City of Cincinnati*, 39 F. Supp. 2d 1013 (S.D. Ohio 1999).  *Johnson* dealt with a "failure to train" claim brought against defendant City of Cincinnati, which resulted from the death of an arrestee who was "placed face down on a stretcher with his legs tied and his hands cuffed behind his back."  *Id*. at 1014.[7]  In denying the city's motion for summary judgment, the Southern District of Ohio held that two doctors' positional asphyxia theories satisfied the *Daubert* standard, could be considered as evidence, and could therefore defeat summary judgment by creating a factual dispute on the element of "whether the manner by which the Defendants restrained [the arrestee] closely related to or caused his death."  *Id*. at 1017.  Plaintiff now seems to suggest that the Southern District's recognition of positional asphyxia as admissible evidence clearly established the right to be free from the hog-tie restraint and the method of transport at issue in this case.  The Court is not persuaded.

---

[7] The *Johnson* case did involve claims of excessive force against the arresting officers, but those claims were not at issue in the Court's decision.  The only claim at issue was the City's "failure to train claim."  *See* 39 F. Supp. 2d at 1014.

24

Notably, *Johnson* did not involve a hog-tie restraint, *id*. at 1014, and this case does not involve any evidence of positional asphyxia.  But even setting these distinctions aside, the Court fails to see how *Johnson*–a case which simply allowed consideration of competing scientific theories via a "classic battle of the experts," *id*. at 1017–*clearly established* the right to be free from restraint methods that might cause positional asphyxia.  To the contrary, the Sixth Circuit's decision in *Champion*, *supra*, directly undermines such a reading of *Johnson*.  In *Champion*, a suspect lay prone on the ground with his hands cuffed behind his back and his ankles cuffed together with a "hobbling device."  380 F.3d at 897-98.  The suspect later died after officers pepper sprayed his face and used their knees to apply significant pressure to his back. *Id*.  The Sixth Circuit denied qualified immunity and held that "putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated" violates a clearly established right.  *Id*. at 903.  Additionally–and of particular relevance to Plaintiff's invocation of *Johnson* in the instant matter–the *Champion* court explicitly declined to decide whether instances of positional asphyxia that result from leaving a suspect in the prone position, but do not involve application of pressure to the suspect's back, are violative of a clearly established right.  *See id*. at 904 n.2 ("Because we are not confronted with such a situation, we need not decide whether such behavior violates a clearly established right.").  Thus, Plaintiff's argument that *Johnson* clearly established a right to be free from restraint methods that might cause positional asphyxia is unavailing.  Instead, the Court finds that "the lack of precedent from either the Supreme Court or the Sixth Circuit, combined with the split of authority over the restraint

25

method used by the officers qualifying as excessive force, requires a finding that no constitutional right was violated." *Simpson*, 2010 U.S. Dist. LEXIS 114941, at *16.[8]

## E. Failure to Intervene

"[A] police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring. *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997) (citing *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)).

With regard to Lewis' taser deployments, Officers Young, Haynes, and Murphy are immune because use of the taser was reasonable and did not involve a clearly established right. Further, Officers Ray, Cornell, and Konz are not liable for failing to prevent Lewis' use of the taser because it is undisputed that they did not arrive on the scene until after the tasings occurred.

With regard to the hog-tie and method of transport, all officers are immune because the force was reasonable and did not involve a clearly established right.

---

[8] The Court notes that the Tenth Circuit cited *Johnson* in determining that hog-tie restraints violate clearly established rights under certain circumstances. *See Cruz v. City of Laramie, Wyoming*, 239 F.3d 1183, 1188 (10th Cir. 2001) (officers may not use hog-tie when suspect has diminished capacity that is apparent). The *Cruz* decision did not, however, suggest that *Johnson* clearly established hog-tying as violative of the *Fourth Amendment*. Instead, *Cruz* simply noted that *Johnson* highlighted positional asphyxia as "a nationwide problem." *Id*. Such a statement is not at odds with this Court's reading of *Johnson*, and in any event, the persuasive value of the Tenth Circuit's *Cruz* decision does not outweigh that of *Champion*, *supra*, or *Simpson*, *supra*. *See Landis*, 2008 U.S. App. LEXIS 21946, at **24-**25 ("district court must first look to decisions of the Supreme Court, then decisions of [the] Sixth Circuit and other courts within the circuit, and finally to decisions in other circuits.").

**F.  Deliberate Indifference to a Serious Medical Need**

It is clearly established that pretrial detainees have a *Fourteenth Amendment* right to adequate medical treatment, a right that is analogous to a prisoner's rights under the *Eighth Amendment*.  *Watkins v. City of Battle Creek*, 273 F.3d 682, 685-86 (6th Cir. 2001) (citations omitted).  Even so, the Court finds that all Defendant TPD Officers are immune from claims that they were deliberately indifferent to Turner's medical needs because their conduct was not violative of that right.

In *Estelle v. Gamble*, 429 U.S. 97, 102 (1976), the Supreme Court held that "deliberate indifference to serious medical needs" violates the right to adequate medical care.  *Id*.  Establishing "deliberate indifference" requires proof of an objective component and a subjective component. *Comstock v. McCray*, 273 F.3d 693, 702 (6th Cir. 2001).  "The objective component requires the existence of a 'sufficiently serious' medical need."  *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004).  The subjective component requires a showing that officials were subjectively "aware of facts from which the inference could be drawn that a substantial risk of harm exists," and that they actually "[drew] the inference."  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Plaintiff unpersuasively suggests that the knowledge requirement under *Estelle*'s second prong is objective, and that Defendants *should have known* that Turner had a serious medical need. Plaintiff relies on *Weeks v. Chaboudy*, 984 F.2d 185 (6th Cir. 1993), and *Blackmore*, *supra*.  Both cases are inapposite.  In *Weeks*, the discussion of what the defendants "should have known" had nothing to do with the court's analysis under the second prong, and it certainly did not suggest that the second prong involves anything other than a subjective inquiry about defendants' knowledge of

27

a serious medical need.  Indeed, the court found that "it is uncontroverted that Dr. Chaboudy knew of [plaintiff's] paraplegia."  984 F.2d at 187.  *Weeks*' analysis of what the defendants "should have known" was limited to whether plaintiff's parapalegia, under the *first prong*, was objectively sufficiently serious to require admission to the infirmary.  *Id*. Similarly, *Blackmore* unambiguously limits its discussion of objectivity to *Estelle*'s first prong.  390 F.3d at 897 (citations omitted) ("[t]his Court has evaluated the seriousness of a prisoner's medical needs by this 'obviousness' approach.").

Turning to the instant matter, Plaintiff cannot meet her burden of proving deliberate indifference under *Estelle*.  Plaintiff points out that Dr. Cynthia Beisser, the Lucas County Deputy Coroner and forensic pathologist who performed Turner's autopsy, "documented numerous injuries on Mr. Turner from the wrist and ankle shackles, as well as the taser."  (Doc. 180 at 1-2). Additionally, Plaintiff notes that Dr. Beisser found that "Turner died from sudden arrhythmia due to the culmination of the stress and physical exertion from the altercations and multiple tasings while in the custody of the Toledo Police Department, as well as the altercations and multiple tasings that took place after his transfer to the custody of the Lucas County Sheriff's Department at the jail."  *Id*.

Regarding injuries from the wrist and ankle shackles, and from the taser, Lewis and Young testified that Turner did not have any marks or scuffs, and did not otherwise appear injured. (Young Dep. at 27:6-9; Lewis Dep. at 77:13-18, 78:3-8).  Cornell testified that Turner made no complaints of a physical nature.  (Cornell Dep. at 18:18-19:6).  Indeed, Plaintiff does not point to any evidence that the officers knew or suspected that Turner suffered from such injuries.  *Cf. Farmer*, 5111 U.S. at 842-843 ("An official may not avoid a finding of deliberate indifference if

28

the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist."). Plaintiff also fails to offer any argument as to how such injuries are sufficiently serious under *Estelle*.

Regarding the possibility that Turner could have suffered from positional asphyxia–an assertion that Plaintiff does not make in the "deliberate indifference" context, but which this Court nonetheless addresses–Plaintiff has not pointed to any evidence that the officers thought Turner suffered from the condition, let alone any evidence that he actually did. All officers stated that Turner continued shouting and violently resisted throughout the entire incident. Moreover, Cornell, Konz, and Sergeant Ray discussed the dangers of positional asphyxia and took steps to affirmatively monitor for the condition during Turner's transport. These steps included constant observation by Konz, and constant dialogue between Konz and Turner. Konz's observations never indicated positional asphyxia, and Konz's communications were met with repeated obscenities. Finally, the LCJ booking officer indicated that Turner did not have any obvious pain, injury, or illness suggesting the need for nursing intervention. (Doc. 298 at 34).

Regarding Dr. Beisser's finding that Turner died from sudden arrhythmia resulting from the culmination of stress and physical exertion from altercations and multiple tasings, Plaintiff again fails to point to any evidence showing that the officers knew of the problem. Again, all officers maintain that Turner did not exhibit any physical problems whatsoever, and the LCJ booking officer found no need for Turner to receive medical attention.

**V. State Law Claims**

Plaintiff contends that the conduct engaged in by Lewis, Young, Haynes, Murphy, Cornell, and Konz establishes claims for assault and battery under Ohio law.[9]

> In Ohio, an assault is an unlawful offer or attempt, coupled with a present ability, to inflict an injury upon the person of another.  A battery occurs when a person acts intending to cause a harmful or offensive contact, and when a harmful contact results.  Contact which is offensive to a reasonable sense of personal dignity is offensive.

*Woods v. Miamisburg City Schs.*, 254 F Supp. 2d 868, 878 (S.D. Ohio 2003) (internal citations omitted).  Defendants counter that they are entitled to qualified immunity pursuant to OHIO REV. CODE ANN. § 2744.01 *et seq*., which immunizes police officers for injuries and losses allegedly caused by their acts or omissions, unless:

> (a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
>
> (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;
>
> (c) Civil liability is expressly imposed upon the employee by a section of the [Ohio] Revised Code.

*See* Ohio Rev. Code § 2744.03(A)(6); *Margrum v. Meinke*, 332 F. Supp. 2d 1071, 1083 (N.D. Ohio 2004).

Plaintiff's briefs do not add any substantive arguments regarding state law claims, but simply note that "Fourth Amendment excessive force claims and Ohio assault and battery claims apply the same 'reasonableness' standard; therefore, 'state law claims for assault and battery rise and fall with [Plaintiff's] Fourth Amendment excessive force claim.'" (Doc. 180 at 35) (citing

---

9

Plaintiff's response to Sergeant Ray's motion does not argue that Sergeant Ray is liable for assault and battery under Ohio law.  To the extent Plaintiff alleges assault and battery claims against Ray, he is immune for the same reasons as the other officers.  Moreover, it is undisputed that Sergeant Ray never touched Turner during the entire incident.

*Margrum*, 332 F. Supp. 2d at 1083).  Because Defendants' conduct was reasonable under the

*Fourth Amendment*, Plaintiff's state law claims for assault and battery fail.

**VI.  Failure to Train**

Defendants City of Toledo, Toledo Police Department, Lucas County,[10] and Lucas County

Sheriff's Department seek summary judgment on Plaintiff's Section 1983 claims alleging that

Defendants failed to "provide adequate training in light of foreseeable consequences that could

result from the lack of instruction."  *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999); *see also*

*Monell v. Dep't of Social Svcs.*, 436 U.S. 658 (1978) (municipalities may be held liable under

Section 1983); *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989) (articulating municipalities'

Section 1983 liability for failure to train); *Edwards*, 554 F. Supp. 2d at 808-09 (outlining Supreme

Court and Sixth Circuit precedent for failure to train claims).  To prove her failure to train claim,

Plaintiff must establish: "(1) that the training program was inadequate for the tasks that officers

must perform; (2) that the inadequacy was the result of the city's deliberate indifference; and (3)

that the inadequacy was 'closely related to' or 'actually caused the . . . injury.'" *Russo*, 953 F.2d at

1046 (citing *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989)).  Plaintiff cannot satisfy this test,

and Defendants are therefore entitled to summary judgment on Plaintiff's failure to train claims.

First, Plaintiff has not shown that Defendants' training programs were inadequate.

Defendants have introduced evidence regarding how they train their officers and deputies on taser

---

[10]

The caption of the summary judgment motion filed by Counsel for Defendant Lucas County and Lucas County Sheriff's Department names the Sheriff's Department only.  (Doc. 160).  A majority of the body of the motion likewise refers only to the Sheriff's Department, though a portion refers to Lucas County.  *Id*. at 6.  Similarly, Plaintiff's opposition brief refers mostly to the Sheriff's Department, but does refer to the County as well.  (Doc. 160 at 11).  The Court construes the motion as seeking summary judgment for both the Sheriff's Department, and the County.

use, methods of restraint, and identification of medical needs.  Conversely, Plaintiff alleges that at the time of the incident, none of the Defendants had a policy regarding whether officers and deputies "should refrain from tasing a restrained subject," whether "precautions should be taken in tasing or attempting to restrain a subject who has already been tased," and whether there is a "maximum number of times a person can be tased."  (Doc. 160 at 13-14).  But Plaintiff has neither offered authority to show that Defendants should have provided the training she articulates in her brief, *see Edwards*, 554 F. Supp. 2d at 810 ("[p]laintiffs have not offered any caselaw, statutes, national or local law enforcement policies, or some other policy [to] suggest Defendants should have offered training on this specific issue"), nor has she demonstrated that the training Defendants did provide "was inadequate for the tasks that officers must perform."  *Russo*, 953 F.2d at 1046; *see also Canton*, 489 U.S. at 390 ("In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform.").  Indeed, while case law suggests that a taser should not be used on a suspect who has been subdued and who does not pose a threat, *see Roberts*, 2007 U.S. App. LEXIS 14514, at **8-**9, case law does not necessarily forbid tasing a restrained subject.  *See Goebel*, 2007 U.S. Dist. LEXIS 68560, at *19-*21 (two tasings on already handcuffed suspect reasonable); *DeVoe*, 2006 U.S. Dist LEXIS 5326, at *5, *22 (reasonable to tase already-handcuffed suspect); *Johnson*, 434 F. Supp. 2d at 479-80 (reasonable to tase already-handcuffed suspect).  Moreover, Plaintiff has not provided authority to suggest that there is a *per se* maximum number of times a person can be tased.  *Contra*, *e.g.* *Goebel*, 2007 U.S. Dist. LEXIS 68560, at *15-*22 (eight plus tasings not a constitutional violation).  Further, even if the TPD officers' conduct in this particular case were unreasonable, Plaintiff has still failed to negate the evidence showing that they were adequately trained.  *See*

32

*Canton*, 489 U.S. at 390-91 ("That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. . . .  Neither will it suffice to prove that an injury or accident could have been avoided if an officer had better or more training, sufficient to equip him to avoid the particular injury-causing conduct.  Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal.") (internal citations omitted); *accord Sova v. City of Mount Pleasant*, 142 F.3d 989, 904 (6th Cir. 1998).  Thus, Plaintiff has failed to demonstrate how the training that Defendants did provide "was inadequate for the tasks that officers must perform."  *Russo*, 953 F.2d at 1046.

Second, even if Plaintiff could demonstrate that the training was inadequate, Plaintiff introduces no evidence that the inadequacy results from deliberate indifference.  *See Edwards*, 554 F. Supp. 2d at 810 ("a plaintiff's allegations of inadequate training will not trigger § 1983 liability, unless the situation causing the injury is recurring such that the Court may impute prior knowledge and deliberate indifference to the municipality.").

Third, to the extent Plaintiff focuses on allegedly inadequate training related to the dangers of positional asphyxia, Plaintiff does not explain how such inadequacies "closely relate to" or "actually caused" Turner's death.  *Russo*, 953 F.2d at 1046.  The Coroner found that "Turner died from sudden arrhythmia due to the culmination of the stress and physical exertion from the altercations and multiple tasings while in the custody of the Toledo Police Department, as well as the altercations and multiple tasings that took place after his transfer to the custody of the Lucas County Sheriff's Department at the jail."  (Doc. 180 at 34).  Turner's tasings, physical altercations,

and exertions against the hog-tie are arguably encompassed by Dr. Beiss's statement.  Moreover, while positional asphyxia resulting from Turner's restraints would also arguably be encompassed, Plaintiff has not pointed this Court to any evidence that Turner actually experienced positional asphyxia.  Plaintiff's avid focus on the dangers of the condition does not make up for this absence of evidence.

Therefore, Defendants City of Toledo, City of Toledo Police Department, Lucas County, and Lucas County Sheriff's Department are entitled to summary judgment on Plaintiff's claims.

## VII.  Conclusion

For the reasons stated herein, Lewis, Young, Haynes, Murphy, Cornell, Konz, and Ray's motions for summary judgment and applications for qualified immunity are granted.  (Doc. 133; Doc. 167; Doc. 169; Doc. 184).  The City of Toledo, City of Toledo Police Department, Lucas County, and the Lucas County Sheriff's Department's motions for summary judgment are granted. (Doc. 148; Doc. 153).  Cornell and Konz's motion to strike is granted.  (Doc. 145).  Case Closed.

IT IS SO ORDERED.

  S/ *David A. Katz*  
DAVID A. KATZ  
U. S. DISTRICT JUDGE